# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DENNIS HILDERBRAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-3170 |
| | ) | |
| NATIONAL ELECTRICAL BENEFIT | ) | |
| FUND, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the parties' cross-motions for summary judgment.  Because Defendant National Electrical Benefit Fund's (NEBF) denial of benefits was not arbitrary and capricious, NEBF's Second Motion for Summary Judgment (d/e 26) is GRANTED and Plaintiff Dennis Hilderbrand's Motion for Summary Judgment Following Remand and Motion for Sanctions (d/e 22) is DENIED.

# I. BACKGROUND

The following facts are taken from NEBF's Statement of Undisputed Facts and other evidence in the record.[1]

The NEBF is a multi-employer employee pension benefit plan within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1002(2)). NEBF's Statement of Undisputed Fact No. 1. The NEBF was established pursuant to an agreement between the International Brotherhood of Electrical Workers and the National Electrical Contractors Association providing retirement benefits to participants upon their retirement from the electrical industry. Id. The NEBF is governed by the Plan of Benefits for the NEBF (Plan). Id. at No. 2. Hilderbrand is a participant in the NEBF by virtue of the work he performed in covered employment and is 100% vested. Id. at No. 4.

On October 9, 2002, Hilderbrand (d/o/b October 22, 1958) was injured at work while operating a piece of machinery. See, e.g.,

---

[1] Hilderbrand failed to comply with Local Rule 7.1(D). For example, Hilderbrand did not cite documentary evidence in support of each fact (CDIL-LR 7.1(D)(1)(B)), did not respond to NEBF's undisputed facts (CDIL-LR 7.1(D)(2)(b)), and did not include an "Argument" section in his Motion, instead including argument in his "Statement of Facts" section (CDIL-LR 7.1 (D)(1)). However, because the facts appear to be largely undisputed, the Court finds no reason to require strict compliance with the Local Rule, which would further delay resolution of this matter.

Administrative Record at 60 (d/e 15) (hereinafter cited as "R." and the page number of the Administrative Record).  Hilderbrand suffered lacerations on his lower right leg.  Id.  The lacerations were repaired, but Hilderbrand continued to experience pain in his lower leg.  Id.

## A.    The Medical Evidence Between 2004 and 2008 Shows Hilderbrand's Condition and Restrictions

In November 2004, Hilderbrand had surgery on his leg to release the right peroneal nerve.[2]  R. 199.  The surgery was performed by Dr. Susan Mackinnon, Shoenberg Professor and Chief, Division of Plastic and Reconstructive Surgery, Washington University.  Id.

On December 8, 2004, Hilderbrand saw Dr. Mackinnon, who reported that Hilderbrand was "doing well."  R. 209.  She prescribed him a Lidoderm patch for the dorsal aspect of his foot.  She recommended start physical therapy and recommended that he follow up with his pain management physician.  Id.

---

[2] "The peroneal nerve is on the outside of the fibula just below the knee." http://www.mayoclinic.org/diseases-conditions/foot-drop/multimedia/peroneal-nerve/img-20008172 (last visited November 16, 2015).

On December 27, 2004, Dr. Mackinnon noted that Hilderbrand was still having some discomfort but that there was nothing more she could offer him from a surgical point of view.  R. 211.  Dr. Mackinnon recommended that Hilderbrand be evaluated by the pain management team as a candidate for a dorsal column stimulator.[3]  R. 211.

On January 25, 2005, Hilderbrand saw Dr. Muhammad Munir, Instructor in Anesthesiology, Barnes-Jewish Hospital, Washington University Pain Management Center.  R. 213.  Dr. Munir noted that, after the surgery, Hilderbrand had relief of his pain in the back of his calf but continued to have persistent pain in the top of his leg and top of his foot.  R. 213.  Hilderbrand reported that, since the surgery, Hilderbrand "felt a sharp shooting and stabbing pain, like electrical sensation going down on the lateral and top part of his leg and into the foot." Id.  Hilderbrand described the pain as an " 8-9/10 at its worst and with electrical sensation to

---

[3] A dorsal column stimulator "is an implanted electronic device used to help treat chronic pain.  . . . The device delivers a low level electrical current though wires" that are "placed in the area near [the] spinal cord." http://sosspine.com/dorsal_column_stimulator (last visited November 16, 2015).

10/10." Id. Application of light massage, light touching, cold packs, and a Lidoderm patch provided some relief.  Id.

On March 1, 2005, Hilderbrand underwent a psychological evaluation.  R. 217.  During the evaluation, Hilderbrand complained of pain and reported that activity, standing, and walking increased his pain.  R. 217.  He expressed an interest in returning to work.  R. 219.

On August 1, 2005, Hilderbrand saw Dr. Munir regarding back pain he was experiencing.  Dr. Munir did not know the cause of Hilderbrand's "back injury."  R. 224.

On November 9, 2005, Hilderbrand saw Dr. Robert Swarm, Chief, Clinical Pain Management, Barnes-Jewish Hospital, Washington University Pain Management Center.  R. 221.  Hilderbrand continued to have significant right lower extremity neuropathic pain.  Hilderbrand described right lower leg and ankle pain that was continually present. R. 221.  The pain worsened with activity.  R. 21.  Elevation of the right lower leg gave him some relief, as did rest.  Id.   In addition to pain, Hilderbrand suffered from episodic swelling.  The pain increased with the exposure to cold and with cold weather.  Id.

On June 12, 2006, Hilderbrand returned to see Dr. Swarm at the Pain Clinic.  R. 226.  Hilderbrand complained of pain in the right anterior foot as well as the right anterior and lateral ankle. The pain was always present but worsened by having the foot in a dependent position and with standing and walking.  Id.  Dr. Swarm found Hilderbrand significantly limited in his ability to walk.  R. 226.  Hilderbrand used a cane 90% of the time.  Hilderbrand estimated his maximum walking distance was 50 yards without having to stop due to pain.  Id.  He had marked tenderness in the right foot and ankle area.  Id.  Dr. Swarm noted that: "We discussed that he is able to sit quietly and could do productive work, although he requires periodic elevation of the lower extremity."  R. 226.  Dr. Swarm's impressions included:

> Continued work restrictions:  Mr. Hilderbrand is restricted to light duty, sedentary work with allowances for elevation of the right lower extremity.  He is able to stand for a maximum of 15 minutes total every 2 hours. Walking is limited to a maximum of 40 yards on a rare basis, and he would need to be able to use a cane.

R. 227.  The work restrictions were permanent.  Id.  Dr. Swarm also found that Hilderbrand was not at a point of maximal medical improvement.  R. 227.

On November 27, 2006, Hilderbrand returned to the Pain

Center complaining of pain.  R. 229.  Dr. Swarm again noted

Hilderbrand's work restrictions:

> Permanent work restrictions resulting from work-related injuries suffered in October 2002:  Light duty, sedentary work with allowances for elevation of the right lower extremity.  He is able to stand for a maximum of 15 minutes total every two hours.  Walking is limited to a maximum of 40 yards on a rare basis, and he would need to be able to use a cane.

R. 229.

On January 19, 2007, Hilderbrand underwent a spinal cord

stimulation.  R. 232.  At a visit to the Pain Center on April 18,

2007, Hilderbrand continued to complain of pain.  R. 234.   Dr.

Swarm indicated a "[f]ailed trial of spinal cord stimulation

1/22/07."  Id.  Dr. Swarm again noted Hilderbrand's work

restrictions:

> Permanent work restrictions resulting from work-related injuries suffered in October 2002: Light duty, sedentary work with allowances for elevation of the right lower extremity.  He is able to stand for a maximum of 15 minutes total every two hours.  Walking is limited to a maximum of 40 yards on a rare basis, and he would need to be able to use a cane.

R. 234.

On July 16, 2007, Hilderbrand returned to the Pain Center complaining of pain in his right lower leg and foot.  R. 236.  Dr. Swarm noted the same work restrictions as identified on April 18, 2007.  Id.

On January 9, 2008, Hilderbrand saw Dr. Jacques VanRyn of Premier Care Orthopedics for a consultation.  R. 238.  Dr. VanRyn found that Hilderbrand was at maximum medical improvement for his condition—complex regional pain syndrome.  R. 240.  Dr. VanRyn also found that Hilderbrand "should have permanent restrictions consistent with the recommendation of Dr. Swarm":

> These would be sedentary work only, standing for a maximum of 15 minutes/two hours, or one hour per day. Walking should be limited to a maximum of 40 yards on an infrequent basis with the use of a cane, as well as the ability while sitting to elevate the right leg.  These restrictions would necessarily remove him from an occupation for which he has had suitable education or training.  Thus, re-education towards a job that he could do on a sedentary basis would be necessary.  I do not feel that a functional capacity evaluation will be of any further value in assessing the case.

R. 240.

**B.    Hilderbrand's First Application for Social Security Benefits Resulted in a Finding of Disability From October 9, 2002 through December 8, 2004**

On March 29, 2004, Hilderbrand filed an application for disability benefits with the Social Security Administration alleging disability beginning October 9, 2002.  R. 97.  On April 18, 2007, Administrative Law Judge Alice Jordan found Hilderbrand "disabled" within the meaning of the Social Security Act from October 9, 2002 through December 8, 2004.  R. 91-111.  ALJ Jordan found that medical improvement occurred as of December 9, 2004, following Hilderbrand's recovery from a surgical procedure to release the peroneal nerve.  R. 104.

ALJ Jordan concluded that, beginning December 9, 2004, Hilderbrand had the residual functional capacity to perform work that: required the ability to lift or carry up to 10 pounds occasionally or frequently and that accommodated the use of a hand-held device (a cane) for assistance with ambulation; allowed sitting for 6 to 8 hours with the accommodation to elevate the leg as needed; required no more than 2 hours of standing or walking with the use of a hand-held device; required no climbing or crawling, and only occasional balancing, crouching, or kneeling; and required no

exposure to hazards.  R. 105.  In making the residual functional capacity determination, ALJ Jordan considered medical records as recent as November 27, 2006[4], as well as Hilderbrand's testimony at the hearing that he thought he could work if his needs, including elevating his leg, were accommodated.  R. 106-09.  ALJ Jordan noted that Hilderbrand could not perform the full range of sedentary work.  R. 110.  Therefore, the ALJ asked the vocational expert whether jobs existed in the national economy for a person with claimant's age, education, work experience, and residual functional capacity as of December 9, 2004.  Id.  The vocational expert testified that such jobs existed in significant numbers in the national economy.  Id. (citing general office clerk, cashier, and dispatcher). Therefore, ALJ Jordan found Hilderbrand "not disabled" as of December 9, 2004.  R. 111.

---

[4] ALJ Jordan relied on Dr. Swarm's medical report "which identified permanent work restrictions of: light duty, sedentary work with allowances for elevation of the right lower extremity; able to stand for a maximum of 15 minutes total every two hours; walking limited to a maximum of 40 yards on a rare basis and the need to use a cane."  R. 109 (ALJ decision); R. 229 (Dr. Swarm report).  ALJ Jordan also found the restrictions consistent with her own findings.  Id.

**C.   Hilderbrand's Second Application for Social Security Benefits Resulted in a Finding of Disability Beginning October 2008**

On July 30, 2007, Hilderbrand filed a second application for disability benefits with the Social Security Administration. R. 177; 181.  On December 2, 2008, ALJ John Dodson found Hilderbrand disabled under sections 216(i) and 223(d) of the Social Security Act since October 21, 2008.  R. 177-81.   ALJ Dodson found no basis for reopening Hilderbrand's prior application.  R. 177.  Moreover, ALJ Dodson observed that Hilderbrand had amended the alleged onset date of disability to October 21, 2008 (the day before Hilderbrand's 50th birthday).  R. 177.

ALJ Dodson found that Hilderbrand had the residual functional capacity to perform sedentary work except that he was limited to work that accommodated the use of a hand-held device for assistance with ambulation.  R. 179.  In addition, the work should: allow sitting for 6 to 8 hours with accommodation to elevate the leg as needed[5]; require no more than 2 hours of standing or walking with the use of a hand-held device; require no climbing or

---

[5] ALJ Jordan and ALJ Dodson both mistakenly refer to Hilderbrand needing to elevate his <u>left</u> leg. R. 105, 179.

crawling and only occasional balancing, crouching, and kneeling; and require no exposure to hazards.  R. 179.  Hilderbrand could not perform his past relevant work.  ALJ Dodson found, considering Hilderbrand's age, education, work experience, and residual functional capacity, that there were no jobs that existed in significant numbers in the national economy that Hilderbrand could perform.  R. 180.  Specifically, ALJ Dodson examined the Medical-Vocational Guideline (20 C.F.R. Part 404, Subpart P, Appendix 2 (a/k/a "the Grid")) which directed a finding of "disabled" even if Hilderbrand could have performed the full range of sedentary work.  R. 180.

Taking into account the two Social Security decisions, Hilderbrand received Social Security benefits beginning April 2003 and ending March 2005 (R. 12) and again beginning November 2008 (R. 31).

### D.  Hilderbrand's Application for NEBF Benefits Is Granted in Part and Denied in Part

In January 2012, Hilderbrand completed an NEBF Participant Pension Benefit Application seeking disability benefits.  R. 1.  The Plan is self-administered by its Trustees.  R. 399.

The Plan defines disability as follows:

> To be entitled to a Disability Pension Benefit, a
> Participant must be unable to engage in any substantial
> gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to
> result in death or has lasted or can be expected to last for
> a continuous period of not less than twelve (12) months[.]

R. 334.  This is the same definition used by the Social Security

Administration.  See, e.g., R. 115, 158; see also 42 U.S.C.

§ 423(d)(1)(A).  The Plan further provides:

> Proof of such disability must be filed with the NEBF and
> shall consist of a Social Security Disability Award or such
> other proof as the Trustees may require.

R. 334.

In March 2012, the NEBF approved Hilderbrand's application

for disability benefits in part.  R. 53.  The NEBF awarded

Hilderbrand benefits of $640 per month (minus tax withholding)

beginning in March 2012.  The NEBF also found Hilderbrand was

entitled to a retroactive payment for November 2002 through

February 2012.  However, the years 2005 and 2008 remained under

review.  Id.

In July 2012, counsel for Hilderbrand treated the March 2012

determination as a denial of benefits for the period of March 2005

through October 2008 and asked for a review of that decision.  <u>See</u>

R. 57, 124, 190.  On September 14, 2012, the NEBF denied the

request for benefits for the period of March 2005 through October

2008:

> We reviewed the additional documentation that you sent
> in from your Attorney.  The NEBF's disability benefit is
> based on the Social Security Disability Award.  Therefore,
> if they did not pay you for those years in question (March
> 2005 through October 2008) the NEBF is not required to
> pay you.  Enclosed is a copy of the NEBF Summary Plan
> Description.
>
> If you disagree with our decision or believe our records
> are incomplete or incorrect, you may appeal this decision
> within one hundred and eighty (180) calendar days from
> the date of this letter.  Please direct your appeal to:
>
> 
>
> Trustees
> National Electrical Benefit Fund
> 2400 Research Boulevard, Suite 500
> Rockville, Maryland 20850-3266
>
> 
>
> Remember to include copies of all documents and
> information pertinent to your case.

R. 127.

Hilderbrand appealed and submitted additional information.

<u>See</u> R. 128, 131-271.  The additional information included a

December 28, 2012 Vocational Consultant Report by Bob

Hammond prepared at Hilderbrand's request.  R. 265.  In the

report, Hammond indicated that he reviewed the medical records, employment information, Social Security decisions, and other documents.  R. 265-68.  Hammond noted that all of the doctors agreed that Hilderbrand needed to use a cane 90% of the time; that his maximum walking distance was 40 yards on a rare basis; that Hilderbrand was limited to sedentary work that allowed Hilderbrand to elevate his right leg; and that Hilderbrand could stand for a maximum of 15 minutes every two hours.  R. 268.

In the "Opinions/ Recommendations" section of the report, Hammond noted Hilderbrand's current age (54), which was considered a "person closely approaching advanced age."  R. 268. Hammond also noted that Hilderbrand had not previously held any positions that provided skills for a sedentary level of work.  R. 268. Hammond stated that the Social Security vocational rules for persons of Hilderbrand's age require direct transferability of skills for lower level jobs.  R. 268.  Hilderbrand did not have transferrable skills.  Id.

Hammond also concluded that Hilderbrand would be unable to work even in a sedentary position.  R. 268.  Hammond noted that

Hilderbrand had to be in a seated position and elevate his right leg as needed.  Hammond stated:

> It is suggested the elevation would be above the level an employer would tolerate.  Mr. Hilderbrand would not be able to maintain work pace and persistency that an employer would tolerate.  He would be at a distance or an angle at a distance from his work station and would not be able to meet production goals.  He is also reported to have concentration issues, and this also would reduce his productivity rate and he would not be able to meet the 94-95% productivity rate needed for substantial gainful activity.  SSA-ODAR[6] correctly defined Mr. Hilderbrand as disabled from all work.

R. 268-69.  Hammond concluded that Hilderbrand had less than sedentary ability, which would eliminate all positions in the general labor market.  R. 269.

On February 8, 2013, the NEBF Trustees denied the appeal. R. 281-82.  The NEBF Trustees noted that Hilderbrand must demonstrate total disability under the NEBF's definition of disability, which was the same as the Social Security Administration's definition of disability.  R. 281.  The Trustees held:

> The Social Security Administration affirmatively determined that Mr. Hilde[r]brand was not totally disabled under its definition during the period March 2005 to October 2008, and he had a disability onset date of October 21, 2008.  Mr. Hilde[r]brand is therefore not

---

[6] Social Security's Office of Disability Adjudication and Review.

eligible for disability benefits from the NEBF for the
period March 2005 to October 2008.

R. 281-82.

The Trustees referenced several physician findings cited by
Hilderbrand in his appeal.  The Trustees noted that while
Hilderbrand's physicians restricted Hilderbrand to light duty,
sedentary work that allowed for the elevation of his right leg, none
of the physicians stated Hilderbrand was unable to work.  R. 282.
In addition, the Trustees noted that the Social Security
Administration's December 2, 2008 decision did not find
Hilderbrand totally disabled prior to October 21, 2008.  Id.
Therefore, the NEBF Trustees affirmed the prior denial of
Hilderbrand's application for a disability pension from March 2005
through October 2008.  Id.

## E.  Hilderbrand Files a Civil Action, and this Court Remands the Case to the NEBF

On June 7, 2013, Hilderbrand filed his Complaint seeking
benefits pursuant to ERISA (29 U.S.C. § 1132(a)(1)(B)).  Hilderbrand
alleged the NEBF arbitrarily and capriciously denied him benefits
and a full and fair review of his claim.  Compl., ¶ 18 (d/e 1).  The
parties filed cross-motions for summary judgment.  See d/e 12, 13.

On December 30, 2014, this Court reversed the denial of benefits and remanded the claim for benefits to the NEBF Trustees for a de novo benefits determination.  See Opinion (d/e 19).  Specifically, this Court found that the NEBF, through its Trustees, did not afford Hilderbrand a full and fair review of his claim because the NEBF Trustees did not consider Hammond's vocational report.  Id. at 18.

## F.    The NEBF Issues a New Decision Denying Hilderbrand's Claim

On February 23, 2015, the NEBF Trustees[7] issued a new decision denying Hilderbrand's claim for benefits.  See Decision (d/e 25-1).  The NEBF Trustees concluded that Hilderbrand was not eligible for disability benefits for the months of March 2005 through October 2008.  Id. at 1.

The NEBF Trustees specifically considered the two Social Security Administration decisions, the medical records, Hammond's report, and other documents in the administrative record.  The NEBF Trustees considered whether Hilderbrand demonstrated "the inability to engage in substantial gainful employment as a result of

_____

[7] The review was conducted by four Trustees, three of whom had not previously reviewed Hilderbrand's file.  NEBF's Statement of Undisputed Fact No. 21.

his medical condition." Id. at 4.  The Trustees gave significant weight to the Social Security Administration's affirmative determinations that Hilderbrand was not totally disabled under Social Security rules during the period of March 2005 to October 2008.  Id.  In addition, the Trustees noted that the two medical providers (Dr. Swarm and Dr. VanRyn) who evaluated Hilderbrand between 2005 and 2008 opined that Hilderbrand was then capable of light duty or sedentary work.  Id. at 5.

The Trustees found that this evidence outweighed Hammond's opinion.  Id.  The Trustees noted that Hammond did not observe Hildebrand until 2012.  In addition, although Hammond cited the medical records and past relevant history, Hammond did not specifically opine on Hilderbrand's ability to engage in substantial gainful employment from March 2005 to October 2008.  Id.

## II. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving

party, drawing all reasonable inferences in the nonmoving party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).

Summary judgment is proper if no reasonable factfinder could return a verdict for the non-moving party.  Patton v. MFS/Sun Life Financial Distributors, Inc., 480 F.3d 478, 485 (7th Cir. 2007). "Whether a reasonable factfinder could return a verdict for the nonmoving party is determined in part by the substantive burden of proof that that party faces."  Id.

A district court reviews an ERISA administrator's benefit determination de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the benefit plan gives the administrator or fiduciary such discretion, the district court reviews the decision under the arbitrary and capricious standard.  Id.; see also Jenkins v. Price Waterhouse Long Term Disability Plan, 564 F.3d 856, 861 (7th Cir. 2009).

In this case, the Plan gives the Trustees discretionary authority to interpret the Plan's provisions and review claims:

20.  <u>CONSTRUCTION AND DETERMINATIONS WITH REGARD TO PLAN</u>.  The Trustees shall have full discretionary power and authority to construe and interpret the provisions of this Plan, the terms used herein, and the rules, regulations, and policies related thereto.  The Trustees shall have full, discretionary, and exclusive power and authority to administer the plan and to determine all questions of coverage and eligibility, methods of providing or arranging for the benefits specified in this Plan and all other related matters.  Pension benefits under this Plan will be paid only if the Trustees decide in their discretion that applicant is entitled to them.

R. 353.  Therefore, the arbitrary and capricious standard applies.

Hilderbrand argues, however, that the standard of review should be <u>de novo</u> because Illinois law prohibits the use of a deferential standard of review.  In support thereof, Hilderbrand cites 50 Ill. Admin. Code § 2001.3 and <u>Fontaine v. Metropolitan Life Insurance Company</u>, 800 F. 3d 883 (7th Cir. 2015), a case that was decided after this Court's previous remand.  The NEBF asserts that the Illinois regulation and <u>Fontaine</u> have no application in the case of an employee benefit plan like NEBF.

Section 2001.3 of the Illinois Administrative Code prohibits provisions that purport to reserve discretion to insurers to interpret health and disability policies:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or the provide standards of interpretation or review that are inconsistent with the laws of this State.

50 Ill. Admin. Code § 2001.3.  In <u>Fontaine</u>, the Seventh Circuit considered whether Section 2001.3 was preempted by ERISA.  The Seventh Circuit noted that ERISA preempts state laws that relate to employee benefit plans but saves from preemption state laws that regulate insurance.  <u>Fontaine</u>, 800 F. 3d at 886 (citing 29 U.S.C. § 1144(a), (b)(2)).  The <u>Fontaine</u> court concluded that Section 2001.3 was a law that regulates insurance and was not preempted by ERISA.  <u>Id.</u> at 887-89.  Consequently, although the plan purported to reserve discretion to the insurer to decide benefits, the insurance company's denial of benefits was reviewed <u>de novo</u> because Section 2001.3 prohibited provisions purporting to reserve discretion to the insurer.  <u>Id.</u> at 886.

The <u>Fontaine</u> case, however, has no application to this case.  In <u>Fontaine</u>, the insurance company issued the disability policy (<u>Id.</u> at 892) and the insurance company was granted the discretion to

make the benefits determination.  Id. at 886, 891 (finding it made

no difference that the discretionary clause was contained in the

plan document and not the insurance document).  As such, the

insurance regulation, section 2001.3, clearly applied to prohibit

discretionary review.

In contrast here, no insurance company is involved at all.

NEBF does not offer the benefits through an insurance company

and has not granted an insurance company the authority to make

benefit determinations.  Moreover, Section 1144(b)(2)(B) of ERISA

specifically provides that employee benefit plans described in

section 1003(a) (which is the type of plan at issue here) shall not be

deemed to be an insurance company or deemed to be engaged in

the business of insurance.  29 U.S.C. § 1144(b)(2)(B); see also e.g.,

Harvey v. Machigonne Benefits Adm'rs, 122 F. Supp.2d 179, 185

(D. Maine 2000) (noting that "[b]ecause insured plans have entered

into insurance contracts with insurers, those plans often must

comply with state insurance laws" while "self-funded plans

generally are exempt from state insurance laws").

Therefore, the arbitrary and capricious standard applies in

this case.  Under the arbitrary and capricious standard, the district

court will not overturn an administrator's decision unless the

decision is "downright unreasonable." <u>Mote v. Aetna Life Ins. Co.</u>,

502 F.3d 601, 606 (7th Cir. 2007) (citations and quotations

omitted).  The decision must have rational support in the record.

<u>Black v. Long Term Disability Ins.</u>, 582 F.3d 738, 745 (7th Cir.

2009) (also noting that the standard is not a "rubber stamp").  An

"administrator's decision will be upheld so long as it is possible to

offer a reasoned explanation, based on the evidence, plan

documents, and relevant factors that encompass the important

aspects of the problem." <u>Fischer v. Liberty Life Assurance Co. of

Boston</u>, 576 F.3d 369, 376 (7th Cir. 2009).[8] The administrator must

provide specific reasons for the decision and must afford the

claimant a full and fair review.  <u>Id.</u>  This Court does not reweigh the

evidence but only determines whether the decision was reasonable.

<u>Univ. of Chi. Hosps. v. Cent. States, Se. & Sw. Areas Health Welfare

Plan</u>, 981 F. Supp. 1110, 1116 (N.D. Ill. 1997).

---

[8] Hilderbrand argued in his first Motion for Summary Judgment that NEBF operated under a conflict of interest and that the conflict should factor into the Court's review.  He did not raise that argument in his second Motion for Summary Judgment.

On summary judgment, this Court must determine, taking the evidence in the light most favorable to the nonmoving party, whether NEBF's decision denying Hilderbrand benefits for the period of March 2005 through October 2008 was arbitrary and capricious.  See Semien v. Life Ins. Co. of N.A., 436 F.3d 805, 812 (7th Cir. 2006) ("In this case, to affirm the district court's grant of summary judgment, we must find that when taken in the light most favorable to Semien, there is no evidence LINA's denial of benefits was arbitrary and capricious"); but see Crespo v. Unum Life Ins. Co. of Am., 294 F. Supp. 2d 980, 991-92 (N.D. Ill. 2003) (describing the difficulties of deciding cross-motions for summary judgment in an ERISA case involving an arbitrary and capricious standard of review and recommending that parties in the future agree to a trial on the papers under Federal Rule of Civil Procedure 52(a)).

### III. ANALYSIS

Hilderbrand argues that the Court should reverse the decision of NEBF and award benefits and fees to Hilderbrand.  NEBF argues that, on remand, the Trustees conducted a de novo review of Hilderbrand's administrative appeal and that their determination should be affirmed.

Even taking the evidence in the light most favorable to
Hilderbrand, NEBF's decision was not arbitrary and capricious as
the decision has support in the record.  The NEBF Trustees
considered the medical evidence, the Social Security decisions, and
Hammond's vocational report.  The Trustees offered a reasonable
explanation, based on the evidence, for the determination that
Hilderbrand did not meet the Plan's definition of disability between
March 2005 and October 2008.

Hilderbrand argues that NEBF had an obligation to conduct a
good faith investigation of Hilderbrand's functional ability to work
and should have hired a vocational expert.

The Seventh Circuit has not expressed an opinion "as to
whether ERISA plan administrators as a rule must hire vocational
experts or perform a transferrable skills analysis." Tate v. Long
Term Disability Plan for Salaried Emps. of Champion Int'l Corp. No.
506, 545 F.3d 555, 561 (7th Cir. 2008) (abrogated on other grounds
by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242 (2010)).
However, seven other circuits have held, "to varying degrees, that,
even in the absence of specific plan language, benefit
administrators cannot outright ignore vocational considerations."

Travis v. Midwest Operating Eng'rs Pension Plan, No. 13 CV 12,
2014 WL 4057372, at *5 (N.D. Ill. Aug. 15, 2014) (citing cases from
the First, Second, Sixth, Eighth, Ninth, Tenth, and Eleventh
Circuits).

Regardless, in this case, the NEBF Trustees took the
vocational considerations into account.  The Trustees expressly
considered Hammond's report, as well as the Social Security
Administration decisions and Hilderbrand's treating physicians'
medical reports.  In addition, the first Social Security decision
contained evidence that a vocational expert concluded that jobs
existed in the national economy for an individual with Hilderbrand's
age, education, work experience, and residual functional capacity
as of December 9, 2004.  The NEBF Trustees considered this
evidence when they made their decision.

Hilderbrand next argues that NEBF improperly disregarded
Hammond's report, which was, according to Hilderbrand,
unrebutted.

The NEBF Trustees clearly considered the Hammond report.
The NEBF Trustees concluded that Hammond's report was entitled
to little weight, however, because Hammond did not observe

Hilderbrand until 2012.  Decision at 5.  In addition, although
Hammond cited Hilderbrand's medical records and past relevant
history, he did not specifically opine on Hilderbrand's ability to
engage in substantial gainful employment from March 2005 to
October 2008.  Decision at 5.  This was a reasonable interpretation
of Hammond's report.

   In the Opinion section of the report, Hammond noted
Hilderbrand's current age (54) and the fact that Hilderbrand is
closely approaching advanced age.  R. 268; see also 20 C.F.R.
§ 404.1563(d)(Social Security regulation providing that persons
between the ages of 50 and 54 are considered "closely approaching
advanced age").  The report further noted: "[u]sing vocational rules
for persons of this age, there needs to be direct transferability of
skills for lower level jobs."  Id.  Because in 2005 to 2008
Hilderbrand would not have been a "person closely approaching
advanced age," Hammond was expressing an opinion based on
Hilderbrand's current condition and age and not his condition and
age between March 2005 and October 2008.  See 20 C.F.R.
§ 404.1563(c)(Social Security regulation providing that persons
under age 50 are considered "a younger person").

In addition, Hilderbrand's assertion that Hammond's report was unrebutted is incorrect.  The Social Security decisions contained vocational evidence that supports the NEBF Trustees' conclusion that Hilderbrand could engage in substantial gainful employment between March 2005 and October 2008.

The first Social Security Award found that Hilderbrand was disabled beginning October 9, 2002 and ending on December 9, 2004, when medical improvement occurred.  R. 172. ALJ Jordan determined that, as of December 9, 2004, Hilderbrand had the residual functional capacity to perform work:

> that requires the ability to lift or carry up to 10 pounds occasionally or frequently and that accommodates the use of a hand held device for assistance with ambulation. The work should allow sitting for 6 to 8 hours with the accommodation to elevate the left [sic] leg as needed.  The work should require no more than standing and walking up to 2 hours with the use of a handheld device.  The work should require no climbing or crawling and no more than occasional balancing, crouching or kneeling.  The work should not require exposure to hazards.

R. 166.  In making this determination, ALJ Jordan considered numerous medical records, including the November 27, 2006 medical report by Dr. Swarm "that identified permanent work restrictions of: light duty, sedentary work with allowances for

elevation of the right lower extremity; able to stand for a maximum of 15 minutes total every two hours; walking limited to a maximum of 40 yards on a rare basis and the need to use a cane." R. 170. This limitation by Dr. Swarm is the same limitation he proposed in April 2007 and July 2007, and Dr. VanRyn proposed in January 2008.  See R. 234, 236, 240.

ALJ Jordan specifically noted that Hilderbrand's ability to perform the full range of sedentary work was impeded by his limitations.  R. 171. The ALJ asked the vocational expert whether jobs existed in the national economy for an individual with Hilderbrand's age, education, work experience, and residual functional capacity.  R. 171.  The vocational expert testified that such an individual would be able to perform the requirements of representative occupations such as general office clerk, cashier, and dispatcher.  R. 171.  This vocational evidence is contrary to Hammond's conclusion.

The second Social Security decision also referenced vocational evidence.  ALJ Dodson found Hilderbrand disabled as of October 21, 2008, but this determination was not based on any change in Hilderbrand's physical condition.  In fact, ALJ Dodson's residual

functional capacity finding was almost identical to ALJ Jordan's residual functional capacity finding (only failing to contain any mention of lifting limitations).  Compare R. 105 with R. 179. Instead, the ALJ found that even assuming Hilderbrand could perform the full range of sedentary work, he was considered disabled under the Grid.

Under the Grid, claimants are designated as "disabled" or "not disabled" depending upon their exertional limitations (sedentary, light, medium, heavy, and very heavy), age, education, and work experience.  See Id. Tables 1, 2, 3.  The Grid rules are "based on administrative notice of the numbers of jobs in the national economy at the various combinations of strength categories and vocational factors."  Skutnik v. Colvin, No. 13 CV 7467, 2015 WL 151386 at *2 n.3 (N.D. Ill. Jan. 12, 2015) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a)).  Therefore, "when all factors coincide with the criteria of a rule, the existence of such jobs is established." 20 C.F.R. Pt. 404, Supt. P, App. 2, § 200.00(b).  ALJ Dodson determined that under Rule 201.02, a person of Hilderbrand's age,

education, and work experience who could perform sedentary work is disabled.  C.F.R. Pt. 404, Subpt. P, App. 2 § 201.02.[9]

Therefore, the Trustees had vocational evidence that contradicted Hammond's findings.  The Trustees had evidence that a person under the age of 50 with Hilderbrand's education, work experience, and residual functional capacity was not considered disabled by the Social Security Administration.  Hilderbrand has not pointed to any evidence before the Trustees that anything changed—other than Hilderbrand's age—between the first decision and the second decision.  See, e.g., Social Security Ruling 96-9p (recognizing that "age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work" and, instead, the primary factor in determining whether such individuals are disabled depends on the nature and extent of their functional limitations and restrictions). In fact, even the work restrictions imposed by Hilderbrand's doctors remained the same between the first decision

---

[9] For reasons that are unclear, ALJ Dodson found Hilderbrand was a person of advanced age and applied the Grid rule for persons of advanced age—Medical-Vocational Rule 201.02. R. 180. Hilderbrand was age 50, which is considered a person closely approaching advanced age. See 20 C.F.R. Pt. 404, Supt. P, App. 2, 200.00(g); 20 C.F.R. § 404.1563(d) (persons age 50 to 54 are considered closely approaching advanced age).  However, even under the rules applicable to persons closely approaching advanced age, Rule 201.10, Hilderbrand would have been found disabled.

and the second decision.  <u>Compare</u> Dr. Swarm's November 2006 work restrictions (R. 229) <u>with</u> Dr. Swarm's April 2007 restrictions (R. 234), Dr. Swarm's July 2007 restrictions (R. 236) and Dr. VanRyn's January 2008 restrictions (R. 240).

Hilderbrand next argues that the NEBF Trustees misstated Dr. Swarm and Dr. VanRyn's findings, improperly concluding that Dr. Swarm and Dr. VanRyn contradicted Hammond's report, and mischaracterized Dr. Swarm and VanRyn as stating that Hilderbrand could perform light duty or sedentary work.

Hilderbrand's complaint appears to be that the NEBF Trustees noted Dr. Swarm's opinion that Hilderbrand had permanent work restrictions but was capable of light duty, sedentary work that allowed for elevation of the right lower extremity and Dr. VanRyn's concurrence with Dr. Swarm's opinion that Hilderbrand could perform sedentary work, but that the Trustees failed to note that the physicians also found additional limitations.  The additional limitations included standing for a maximum of 15 minutes total every two hours, walking limited to 40 yards on a rare basis, and the use of a cane.  <u>See</u> R. 229.  Hilderbrand asserts that those

limitations rendered him incapable for performing light or sedentary work.

A plan administrator cannot selectively consider evidence and pick out the statements that support the decision to deny benefits while ignoring the evidence that supports the individual's claim that he is disabled.  See Holmstrom v. Metro. Life Ins. Co., 615 F. 3d 758, 777 (7th Cir. 2010) (citing cases).  However, that is not what the Trustees did here.  The NEBF Trustees noted that the physicians found permanent work restrictions but that Hilderbrand could still work with accommodations for elevating the leg.  The NEBF Trustees' Decision notes other evidence that Hilderbrand's ability to perform sedentary work was limited by the need for accommodations, such as the need to use a cane.  See Decision at 2 (citing portions of the Social Security decisions).  In fact, ALJ Jordan's decision took into account that Hilderbrand could not perform the full range of sedentary work due to his additional limitations but still found, based on the vocational expert's testimony, that Hilderbrand could perform a significant number of jobs in the national economy.  The Trustees also considered Hammond's opinion that Hilderbrand had a less than sedentary

ability.  Therefore, the Trustees did not selectively consider only the
evidence that supported the decision to deny benefits.  The
Trustees' failure to specifically cite the physicians' references to
Hilderbrand's limitations on standing and walking does not
constitute a selective reading of the physicians' records or render
the Trustees' decision arbitrary and capricious.

Hilderbrand also claims that NEBF gave improper weight to
the medical providers, who are untrained in vocational analysis.
However, there is nothing improper about considering physician's
opinions about a claimant's ability to work.  See, e.g., Ruiz v.
Continental Cas. Co., 400 F.3d 986, 992 (7th Cir. 2005) (noting that
the defendant considered reports of doctors who gave opinions on
the plaintiff's ability to work); Walsvick v. CUNA Mut. Ins. Soc'y,
157 F. App'x 887, 890 (7th Cir. 2005) (unpublished) (finding that
the medical consultant cardiologist's opinion that he saw no reason
why the plaintiff could not return to work supported the defendant's
denial of long term disability benefits); Miller v. Ameritech Long
Term Disability Plan, 584 F. Supp. 2d 1106, 1117 (C.D. Ill. 2008)
(McCuskey, J.) (finding the defendant's determination was not
arbitrary and capricious where it was based on the plaintiff's

physician's determinations that the plaintiff could return to work with restrictions and the claims administrator's identification of six positions the plaintiff could perform with her work restrictions).

Hilderbrand relies on a Social Security regulation (20 C.F.R. § 404.1527(d)(1)) and Social Security Ruling 96-5p to support his assertion that a medical doctor does not have the ability or training to determine whether a claimant can perform work.  Reply at 6 (d/e 27).  Social Security regulations and rulings are not applicable under ERISA, although the guiding principles developed in social security cases may be instructive.  See, e.g., Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 695 n.11 (7th Cir. 1992).  While 20 C.F.R.  404.1527(d)(1) specifically provides that the ultimate question of disability is reserved to the Commission, Social Security Regulation 96-5p states that a treating physician's opinion that a claimant is disabled "must not be disregarded" even though it is not entitled to controlling weight or special significance.  Social Security Ruling[10] 96-5p: Policy Interpretation Ruling Titles II and XVI:

---

[10] "Social Security rulings (SSRs) 'are interpretive rules intended to offer guidance to agency adjudicators.'" Nelson v. Apfel, 210 F.3d 799, 803 (7th Cir. 2000) (quoting Lauer v. Apfel, 169 F.3d 489, 492 (7th Cir. 1999)).  SSRs do not have the force of law, but the SSRs are "'binding on all components of the Social Security Administrator.'" Id., also citing 20 C.F.R. § 402.35(b)(1).

Medical Source Opinions on Issues Reserved to the Commissioner;
see also, e.g., Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013)
(finding the ALJ should have addressed the treating physician's
opinion that the claimant could not "handle a full-time job" and
that her ability to work would continue to diminish and should
have provided an explanation for rejecting those opinions).
Consequently, even under the guiding principles of the Social
Security regulations and policies, the NEBF Trustees did not err by
considering the physicians' opinions that Hilderbrand could work
(with accommodation for elevating the leg).

Hilderbrand next argues that while the two Social Security
decisions are relevant, they do not contain all of the medical
evidence considered by the ALJs.  Hilderbrand also argues that
"statements made by ALJ Dodson that a physician[] whose medical
records are not part of the administrative record" are hearsay and
should be given little if any weight.  Reply at 7.  Although
Hilderbrand's argument is not entirely clear, the Court notes that
the Federal Rules of Evidence do not apply in ERISA cases and this
court "reviews the entire administrative record, including hearsay

evidence relied upon by the administrator." <u>Black</u>, 582 F.3d at 746 n.3.

Hilderbrand also argues that the Social Security Administration did not determine that Hilderbrand was not disabled between March 2005 and October 21, 2008.  Although the Social Security Administration did not make that explicit finding, ALJ Jordan found that Hilderbrand was no longer disabled after December 9, 2004.  In December 2008, ALJ Dodson refused to reopen the earlier application and found Hilderbrand was disabled again on October 21, 2008, the day before Hilderbrand reached age 50.  As noted above, ALJ Dodson found Hilderbrand disabled under the Grid based on Hilderbrand achieving the age of 50.  Consequently, the Court finds the NEBF did not misstate the Social Security Administration's holdings.

Hilderbrand also argues that the NEBF's position on Hilderbrand's disability is contradictory.  According to Hilderbrand, the NEBF fails to explain why NEBF claim benefits are payable only if the Social Security Administration found a person disabled but then paid benefits to Hilderbrand from December 2004 to March

2005 despite ALJ Jordan's finding that Hilderbrand was no longer disabled after December 9, 2004.

When the NEBF denied Hilderbrand's appeal of its determination that Hilderbrand was not eligible for benefits during the period of March 2005 through October 2008, NEBF explained that Hilderbrand stopped receiving a Social Security award in March 2005.  See Def. Resp. at 8 (d/e 25); see also R. 12, 31 (showing Hilderbrand received Social Security benefits beginning April 2003 and ending March 2005 and again beginning November 2008).   Therefore, the record explains the alleged discrepancy between the dates the Social Security Administration found Hilderbrand disabled and the dates the NEBF found Hilderbrand disabled.  The NEBF paid Hilderbrand for the same months he received benefit payments from Social Security.  As such, the NEBF did not take a contradictory position.

Hilderbrand argues that NEBF failed to consider the psychological evidence presented by Hilderbrand at Exhibit O. Exhibit O is the Psychological Evaluation conducted by Beverly Field, PhD, on March 1, 2005.  R. 216-219.  Hilderbrand does not explain why NEBF's failure to consider this document is relevant.

Moreover, the denial of Hilderbrand's claim shows that NEBF did

consider Exhibit O but found that it did not address Hilderbrand's

actual or expected ability to engage in substantial activity.  NEBF

also noted that the evaluator recommended:

> that Mr. Hilderbrand "engage in some type of daily
> activity" and reported that he "expressed interest in
> return to work and state[d] that he will be scheduled for
> work evaluation if he is unable to return to his previous
> employment."

Decision at 4 (d/e 25-1).

Finally, Hilderbrand argues that NEBF failed to consider Dr.

Munir's medical report indicating that Hilderbrand had a markedly

antalgic gait, used a cane, had to avoid bearing weight on his right

leg.  Hilderbrand asserts that this evidence is important because it

contradicts NEBF implicit presumption that Hilderbrand medically

improved from March 2005 until October 2008.

The medical report to which Hilderbrand refers was dated

January 25, 2005.  NEBF specifically stated that this record, and

others dated from August 2004 to March 2005, were given little

weight because those records did not address the issue of

Hilderbrand's actual or expected ability to engage in substantial

gainful activity from "March 2005 to November 2008."  Decision at

4.  The determination to give such records little weight was reasonable and did not render NEBF's decision arbitrary and capricious.

In sum, the undisputed facts, even taken in the light most favorable to Hilderbrand, demonstrate that NEBF's decision was not arbitrary and capricious.

## IV. SANCTIONS

In his Motion for Summary Judgment, Hilderbrand also sought sanctions.  However, Hilderbrand did not include any legal basis or argument to support his request for sanctions. Hilderbrand addressed sanctions in his Reply (d/e 28), but arguments raised for the first time in a reply brief are forfeited.  See Johnson v. Root, 812 F. Supp. 2d 914, 924 (N.D. Ill. 2011) ("A party cannot make conclusory and underdeveloped arguments in its open brief and then deign to support and develop those arguments in his or her reply brief"); Griffin v. Bell, 694 F. 3d 817, 822 (7th Cir. 2012) (holding that "arguments raised for the first time in a reply brief are deemed waived").  In any event, the Court does not find sanctions warranted in this case.

# V. CONCLUSION

For the reasons stated, the NEBF's Motion for Summary Judgment (d/e 26) is GRANTED and Hilderbrand's Motion for Summary Judgment Following Remand and Motion for Sanctions (d/e 22) is DENIED.  THIS CASE IS CLOSED.

ENTER: November 16, 2015

FOR THE COURT:

        s/Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE